Esker v. Lutz and I believe we're back to in-person argument. Mr. Field you may step up whenever you're ready. Good morning, Your Honors. My name is Dennis Field and I represent the estate of Edwin Esker. We are here on the review of an order granting summary judgment on the issue of qualified immunity. I'm asking you to reverse the district court's order in judgment, granting summary judgment. Basically this case arises on July 5th, 2017 when Deputy Lutz of Monroe County Sheriff's Department responding to a domestic dispute shot and killed Edwin Esker on his own property. Your review of these facts, as you mentioned earlier, you view the evidence in light most favorable to the party opposing the summary judgment and draw reasonable inferences in favor of the party opposing the summary judgment. So the issue that the court has to look at is what did the officer know at the moment of the confrontation between he and Mr. Esker. What the district court found, he relied on five factors. Mr. Field, I'm gonna just talk a little bit further in terms of the evidence and then you could come back to that please. So it seems to me that a significant factor here is what evidence is in the record about how far away he was from Sergeant Lutz when he had the chainsaw and was walking towards him. So would you agree with me, it seems like the record says that Sergeant Lutz testified that he was approximately 15 feet away. Correct. And then they have an expert that used at the crime scene, he's not an expert technically, but they had someone who came to the crime scene and used GPS data and your expert refutes the data that was used. That is correct. So what is your evidence that's in the record, Mr. Field, that refutes Sergeant Lutz's testimony? First off, when Sergeant Lutz pulls into under the property, he says he pulls into right at the end or into a curb. That's what he says, at the entrance of the curb. He pulls over, he pulls his car over, pulls the front end into the weeds. That's what he says. That's exactly what Detective Meisner said as well. Linda Esker said that he never came around the corner. When the CSI showed up on the scene, the car was pulled not only through, completely through the curve and in the straightaway. So the vehicle had been moved from the time of the that are part of the record, that that vehicle had been moved. Now, the CSI says whenever I'm on a scene, if all feasible, I use a 25-foot tape measure. Okay, now you got to understand, he's measuring from where he found the vehicle. That's what he's saying. I mean, you know, he didn't know about the prior testimony or where the officers said they parked the car, where everybody said the car was originally located. He's measuring from where he found the car. And he said, I always, I use a tape measure if I can. If it's clear, there's no obstruction, I use a tape measure, 25. I got a 25 foot, I got a hundred foot tape measure. He didn't use either one. That's when he used the GPS. But his estimate was that it was less than 50 feet. So let's take his estimate out and you're left with Sergeant Lutz's testimony, that it was 15 feet away. What evidence creates an issue of fact as to whether or not it was 15 feet? The family went out afterwards and looked at that and measured it from where they said the car was when the CSI measured. And they said it was 50 feet. But nobody actually saw from the... Well, they saw where the vehicle... They came out after the fact. Correct. They came out after the fact where they could see what the tires were. I thought, I thought Linda Esker, the wife... Right, she said 25. 25, not 50. But the son who went out and did her son who was actually said it was 50. Okay. What's the son's name? Forget it. Keep going. We'll find it. I don't want to waste your time with that. No, that's fine, Your Honor. That's twin. I think it was Curtis. All right, son says 50, wife says 25. The CSI said it was, you know, in his estimate it was less than 50. A reasonable inference then is it could be that it's 49 feet 11 inches. I mean, that's less than 50. Yeah, but you have to realize, Your Honor, that's from where they found the vehicle. That's not from where the officer says he parked the vehicle. That's not where his... The other deputy said he parked the vehicle. That's not where Ms. Esker said he parked the vehicle. Well, the casings are found in front of the vehicle. The casings were... Well, that's the question, you know, and we raised that because we have... He took a picture of the casings and he takes a picture of the front of the vehicle and yet the plants behind are in front of the casings and behind the casings are all different than what the plants in front of the and I pointed that out. I said, you know, those are what we call cup plants and they're nowhere to be found in front of the vehicle. The CSI couldn't explain that. Yeah. I thought he said he moved some vegetation away in order to take the photograph. Well, you can see right there. He did, but the cup plants are still there. The cup plants are still there when he took the pictures. That's the point. Now, all of a sudden, the cup plants and also, I'll be straight with the court, the red buds, which are in the background, are now missing. Can we go back to distance real quick? Yes, sir. Because I'm just mindful the clock ticking and we want the benefit of your perspective. Oh, yes, sir. All right. So, son says 50 feet. 50 feet is what? 17 and a half yards? Correct. How far are we apart right now? You and I are about 20 feet. Okay. So, what case, so I have to move about three feet closer to you, what case would you rely upon that would say it's a violation of clearly established constitutional rights to use lethal force to approach from that distance with a running chainsaw? What's the best case? I cannot. There is no case right on point, Your Honor. Okay. No, no, no. I know not right on point, but what's the best one? Because you have to show it, violated clearly established, right? You have to. My point is, and throughout the entire thing, is that what this officer did was he was behind the weeds and he ambushed this man. He clearly, you know, because if you take from where the he's not, you know, he opened fire on this man and that's just, that's just, he ambushed him. He's walking toward him with a running chainsaw. Correct. And there's nothing to refute the testimony that when he told him stop, please, that he stopped. Your Honor, yes, there is. There's a testimony of Dr. Gorsuch, Dr. Norfleet, who says at the moment that he was shot, there were three shots, and what happened was the three shots go, pa-pow, pow. That's how they came down. The first two shots, he said the first one, we know that one of the first two shots hit him in the chest. He says that one, that shot hit him up here. What was Mr. Esker doing at that twisting from right to left at that moment? He's bending forward. What is that inference that he's doing? It's an inference that he's putting the chainsaw down. Well, he just got, I don't know, I mean, he just got shot in the jaw, for goodness sakes. Well, and, but here's the thing. He got shot in the jaw, but the first, what we've got is, you've got him doing this, he's doing this, hits him here square in the jaw, but the first shot could have hit him right here, because they were, pa-pow, they were almost instantaneous shots, and that's when Dr. Gorsham says he instantaneously dropped to his knees. That's what the doctor said. He said it completely paralyzed him. It dropped him to his knees. The third shot and the fatal shot, he's, the doctor says is consistent with him being down on his knees. He's completely paralyzed from his chest down. The officer could not know that. He's down on his knees. The officer could not know that. The Fourth Amendment does not require police officers when faced with lethal force. An angry man who had had just threatened to kill his wife and is approaching the officer at close range with a running shot. The officer is entitled to neutralize the threat, completely neutralize the threat. The Fourth Amendment doesn't require him to pause after each shot. It does, I believe it does require him to reflect. No, it does not. There's no case that says that. The officer is entitled to use lethal force to neutralize the threat. That's clearly established law. And we don't use 20-20 hindsight of experts or anybody else. We look at it from the standpoint of the officer at the scene, at the time, faced with the circumstances that he was faced with. Well, that's the question. And even if it was a reasonable mistake in judgment about the distance or the level of the threat, the officer is protected by qualified immunity, as Judge Scudder pointed out. That's why I think that distance is a key question, because if, and that's the problem you have with, what's this fellow's name, Creppen? That range is 13 to 171. Well, 171, you might be in business or something, but I don't know if it's 13 or 1, shooting somebody at 171 feet is a different situation. Shooting somebody at, well, that's just it, Your Honor. But we don't have any idea. All we have is a range. We do have an idea where the vehicle ended up. Yeah, we've been, all right, we've been through it. I get your position. I mean, you're doing the best you can with the facts you have. I get it. You know, and once they move that vehicle, they've eliminated our opportunity to get a true measurement as to what the distance was, or even that, you know, what we have here is the officer and, well, we have the shots occurred. He was seen. Two seconds later, when we've got that, 13, in the conversation, 13 minutes and 45 seconds into the conversation with Ms. Esker, she says she sees the officer pull up. 1347, two seconds later, he's opening fire on Mr. Esker. He says, the officer says, I warned him. Your time has expired. Thank you. Ms. Barron. Good morning. Ann Barron for Officer Christopher Lutz. I just want to pick up on a couple points that you, Your Honor, had mentioned. As we know, the law in this area has been established. I go back almost 30 years to the Cate Courts case in Tom versus Vida, talking about you can't use hindsight. You can't judge this in 2020 because officers are expected to make split-second decisions on what appears to them when they are right there in the situation, which is tense, which is changing. If you go back and look at the case law, it looks like this is de novo review, so the court can review and affirm on any basis. Here, I maintain that the officer's use of excessive force was not unreasonable and that he's also entitled to qualified immunity. You started off with my opponent's argument talking about the distances. What do we have, really? We have Officer Meister's testimony of 15 feet and Officer Lutz's testimony of 15 feet. Those are consistent. Then plaintiff comes to come in and change it all around using the Garmin measurements, talking about almost like a faulty investigation done by Trooper Hentz from Illinois State Police. If you look, there's no evidence in the record anywhere that the car was moved. There's none. There's some testimony that Mr. Esker had mud or dirt on his pants. Well, if there was mud, then you would have expected somebody to see some tracks. There's no evidence out there that the car was moved. And if you look at the SEMKE, who was the plaintiff's expert's report, it says those Garmin measurements can't really be used reliably. They were, Esker's body could have been anywhere between 13 feet and 171 feet from the vehicle. Esker's body in the shell casings could have been as far as 125 feet. So the SEMKE report actually says those measurements at the scene by the officer could not be used reliably as they introduced a level of uncertainty and potential error. The Eskers themselves go out and do a, I don't want to say a reenactment, but some measurements after the fact. And it was Linda Esker who said I think it was about 25 feet. I believe the other son was Jacob. But even those kind of minor ambiguities in the testimony are not enough to relieve the plaintiff of her burden of coming forward with affirmative evidence to defeat our motion for summary judgment. Also looking at the autopsy performed... And can I just pause you there? What you just said is an important statement. The reason you say that is against the backdrop of what the officers testified to about the 15 feet. Absolutely. And this is really all about, it's not a case about what Linda Esker told the dispatcher. This is a case about what the dispatcher told Sergeant Lutz and what Sergeant Lutz observed. So what did Sergeant Lutz know? He knew he was coming to a scene where there had been at least threats of some kind of domestic disturbance or not necessarily an altercation, like a physical altercation, but some kind of yelling and screaming. He was told that the man, Mr. Esker, was at the door. He was told that he was screaming and yelling. He was told that he had threatened to shoot him if he was on the phone. So when Mr. or Officer Lutz arrives, he knows all of those things. And then he also told he appeared to be in drunk or intoxicated. Correct. And he was told that he had the running chainsaw. And he was headed up the driveway towards the corner where I believe the residents and the driveway kind of meet. It's a steep driveway. There's discussion there about there being potholes and things. So he was headed down the driveway and that's when he saw the man as he arrived. He got out of his car. These are the things he did at the scene. He knew he was in a marked car. He got out of his car. He was in full uniform and he went around to the front to try and have a discussion with the man. And the man continued to come forward. Both he and Officer Meister's testimony was consistent in that regard. The man had a running, rubbing chainsaw. His hand was on the idle. He had it held up in front of him. So, you know, in that split-second decisions about what was going on. And I just want to point to Officer Meister's testimony where Officer Meister even said, I pulled my gun or I pulled my firearm because I thought that Mr. Lutz had his taser out and I didn't think a taser would be able to stop this man from advancing. If you look at the court's most recent decision just from last month in the Dockstader case, I believe that's how you pronounce it, very similar situation that the court officers at the scene had their guns pulled and were basically running from cover from the suspect there who had his arm under his shirt and it looked like there appeared he might have a gun. So it's really, this case comes down to what did Officer Lutz know? What did he observe? And he had been told that there was a man who had been in a domestic disturbance who might be drunk, who had threatened to kill the caller, was coming down the driveway with a running chainsaw, and then he made his physical observations. The shots were fired within two seconds or less. I believe the videotape has been, or the audio, has been submitted and it was within his discretion. Can't go back to 2020. We can't consider what alternatives Officer Lutz could have used. That's not the court's role here is to consider all feasible alternatives. I also point to the Plumhoff case which discussed the number of shots over a 10-second period. Officer Lutz is going, that's kind of all on the excessive use of force claim, but he was also entitled to qualified immunity and the case law is pretty clear. Again, you look at the totality of the circumstances. I think we can all agree there's no chainsaw case out there discussing being approached by a man holding a chainsaw, but it is a weapon and there are plenty of cases out there where it's a weapon or a knife. It can be anything. Going back to that Tom case I mentioned earlier, that was like a physical alteration and struggle where there is still a finding of qualified immunity and no unreasonable use of excessive force. Even after, I would say, the testimony from Officer Lutz was uncontradicted that after he drew his firearm, Mr. Esker did nothing. He didn't lay down. He didn't put his hands up. He didn't set the chainsaw down. He continued to advance and he had the discretion as the officer at the scene to use deadly force. He thought his life or at least his bodily harm was an imminent danger. That of himself and his colleague, Officer Meister. Would you agree that he would not have been justified in using force because he was a threat to Mrs. Esker? Because the district court seemed to say both and I don't know. I'm not sure how he could have been a threat to Mrs. Esker that would necessitate lethal force at that point. Right. I would agree with that, that Mrs. Esker was in another area. She was up near the home. Right. And I know plaintiff has discussed some of that in his brief and we agree that it's not about the imminent danger or threat to Mrs. Esker. That had been almost, Mr. Esker had walked away from that scene. So it's really here about the imminent danger to Officer Lutz and to Officer Meister. Talking a little bit about Dr. Norfleet's testimony. I don't want to leave that just kind of out there. Plaintiff presented Dr. Norfleet at his deposition with a hypothetical. But Dr. Norfleet also testified that he did not hold an opinion to a reasonable degree of medical certainty of which shot struck Esker first, second, or third, where each shot entered his body. He did not know if Dr. Norfleet was on his knees, or excuse me, Dr. Norfleet did not know if Mr. Esker was on his knees and going down when the shots two and three were fired. He couldn't conclude that the first shot caused him to fall. And I would say that even if the first shot hit Mr. Esker in some place that he was falling, that could have been perceived by Mr. Lutz as him still moving forward. He wasn't on the ground. This is not a case where the plaintiff was laying on the ground and had basically given up. And Dr. Norfleet also said there's a near infinite number of possible scenarios which could have existed at the scene of which plaintiff's assumptions and hypothetical was just one of them. So I would go back to this court's most recent decision in Dockstader and say, you know, this case can be compared to that, and you have arguments which are not supported by the record. So in that case, the plaintiff argued that the decision to shoot was not reasonable because the suspect was handcuffed, blinded from pepper spray, his face was down on the ground, and he was being attacked by a canine at the time. The court rejected that argument, noting that there was no clear evidence showing how the suspect was positioned when he was shot, and that even if it accepted the plaintiff's position, that did not mean that that officer acted unreasonably during the circumstances. So we would ask on behalf of Sergeant Lutz that the District Court summary judgment order be affirmed. Thank you. Thank you very much. And Mr. Field, your time had expired, so we'll take the case under advisement and move to our next case.